**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

ROBERT WILSON,                                  No. CIV S-08-0338-CMK

        Plaintiff,

   vs.                                                    <u>MEMORANDUM OPINION AND ORDER</u>

COMMISSIONER OF SOCIAL
SECURITY,

        Defendant.

_____/

        Plaintiff, who is proceeding with retained counsel, brings this action for judicial review of a final decision of the Commissioner of Social Security under 42 U.S.C. § 405(g). Pursuant to the written consent of all parties, this case is before the undersigned as the presiding judge for all purposes, including entry of final judgment.  <u>See</u> 28 U.S.C. § 636(c).  Pending before the court are plaintiff's motion for summary judgment (Doc. 21) and defendant's cross-motion for summary judgment (Doc. 23).

## I.  PROCEDURAL HISTORY

        Plaintiff applied for social security benefits on April 13, 2005.  In the application, plaintiff claimed that his disability began on January 1, 2004.  In his application, Plaintiff claimed that his disability is caused by a combination of "feet hurt, walk with a cane, right leg

gives out, low back pain. Depression." (CAR 37, 76). The disability determination and

transmittal noted Plaintiff's primary diagnosis to be affective (mood) disorder, and his secondary

diagnosis as disorders of muscle, ligament and fascia. Plaintiff's claim was initially denied.

Following denial of reconsideration, plaintiff requested an administrative hearing, which was

held on March 5, 2007, before Administrative Law Judge ("ALJ") Mark C. Ramsey.   In a May

15, 2007, decision, the ALJ concluded that plaintiff is not disabled based on the following

findings:

1.   The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through the date of this decision.

2.   The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3.   The claimant's major depressive disorder, marijuana dependence and an anxiety disorder are considered "severe" based on the requirements in the Regulations 20 CFR § 404.1520(c).

4.   These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5.   The undersigned finds the claimant's allegations regarding his limitations are not totally credible for the reasons set forth in the body of the decision.

6.   The claimant has the following residual functional capacity to perform unskilled work. In particular the claimant retains the ability to understand, remember and carry out simple one or two-step instructions. The claimant also has the ability to relate and interact with others with limited public contact and he can adapt to stresses common to a normal work environment. The claimant also can maintain concentration, attention, persistence and pace and he can maintain regular attendance.

7.   The claimant is unable to perform any of his past relevant work (20 CFR § 404.1565).

8.   The claimant is an "individual closely approaching advanced age" (20 CFR § 404.1563).

9.   The claimant has "a limited education" (20 CFR § 404.1564).

10.   The claimant has no transferable skills from semi-skilled work previously performed as described in the body of the decision (20 CFR § 404.1568).

11.     The claimant has no exertional limitations (20 CFR § 404.1545).

12.     Considering the range of work at all levels that the clamant is still functionally capable of performing, in combination with his age, education, and work experience, and using section 204.00 of the Medical-Vocational Guidelines as a framework for decision-making, the claimant is not disabled.

13.     The claimant was not under a "disability," as defined in the Social Security Act, at any time though the date of this decision (20 CFR § 404.1520(g)).

After the Appeals Council declined review on December 15, 2007, this appeal followed.

## II.  SUMMARY OF THE EVIDENCE

The certified administrative record ("CAR") contains the following evidence, summarized below:

1.     Psychiatric Evaluation, July 7, 2005, Joanne M. Roux, MD (CAR 112-23);

2.     Orthopedic Consultative Examination, July 15, 2005, Rajeswari Kumar, MD (CAR 124-30);

3.     Medical Records, April 11, 2005 to October 3, 2005, VA/Redding (CAR 131-54);

4.     Residual Functional Capacity (RFC) Assessment - Mental (DDS physician) (CAR 155-60);

5.     Psychiatric Review Technique Form (DDS physician), January 30, 2006 (CAR 161-74);

6.     Medical Records, March 29, 2000 to July 20, 2006, Veterans Administration (CAR 175-259).

## A.     TREATMENT RECORDS

Plaintiff summarizes his treatment records as follows:[1]

Veteran's Administration(VA)/Redding medical records

A November 24, 1998, x-ray report on his foot reflected a diagnostic impression of:

---

[1]     Plaintiff provides this summary of his treatment records regarding his physical health.  The court finds it accurate, and the Defendant does not raise any error in his determination.  Plaintiff's mental health treatment records are summarized separately.

Mild spurring along the dorsal aspect of the proximal foot bilaterally. Bilateral pes planus. Healed fracture of the distal aspect of the fifth metatarsal of the right foot. No calcaneal spurs are seen.

TR 184.

On March 29, 2000, Mr. Wilson reported painful feet. TR 258.

On July 12, 2000, Mr. Wilson again complained of pain in his feet. He reported that Vicodin and marijuana helped with the pain. He stated that he felt a lot of pain the mid-arch of his feet. He was given a referral to podiatry. TR 257.

A July 12, 2000, radiograph of his feet included the following diagnostic impression:

Radiographs of the right foot show an old healed fracture of the right fifth metatarsal and a very small developing plantar calcaneal spur. No other findings.

TR 183.

July 17, 2000, treatment notes reflected that Mr. Wilson was seen by the podiatrist. He had calluses and pain with palpation of plantar fascia. He was diagnosed with plantar fasciitis. TR 256.

On August 7, 2000, Mr. Wilson was seen for follow-up on his foot pain. He was still experiencing continuous pain in his feet. The plan was for him to be seen for casting for custom foot inserts (orthotics) and given a prescription for Vicodin. TR 255.

On December 18, 2000, Mr. Wilson was not wearing his orthotics as he felt they were too high in the arch and too hard. He also complained of a callus on his right foot. He was diagnosed with porokeratotic lesions and asked to bring in his orthotics for modification. TR 253.

On January 16, 2001, Mr. Wilson reported that his orthotics were causing him pain. He felt that he needed more padding. He was to bring the orthotics back and make a follow-up appointment. TR 252.

On May 14, 2001, Mr. Wilson had his orthotics adjusted but was unable to wear them due to irritation to his feet. He complained the arches were to high. He was to get another adjustment and follow-up in 4-6 weeks. TR 245.

On June 25, 2001, and August 27, 2001, Mr. Wilson had a painful callus on the bottom of his right foot. On both these dates there was debridement of the lesion with relief without bleeding. At both appointments the record reflected that he was to have a

4

reduction in the arches of his orthotics. TR 244.

On February 5, 2002, Mr. Wilson complained of painful callus on the bottom of his right foot. He stated that his feet were no better with the orthotics. He felt that a flat insole and trimming of the callus with a razor would help him, along with the pain medication. He had debridement of the lesion with relief without bleeding and was scheduled to return in 2 months for follow-up. TR 244.

On April 9, 2002, Mr. Wilson complained of a painful callus on the bottom of his right foot. He reported that he felt better with his pain medication. He had debridement of the lesion with relief without bleeding. The record noted that his orthotics arches would be decreased. TR 243.

On August 6, 2002, Mr. Wilson was wearing his orthotics with thick padded insoles but was still experiencing pain. He had a painful callus on the bottom of his right foot. The record reflected that he had debridement of the lesion with relief without bleeding and he had his Vicodin refilled. TR 242.

On October 28, 2002, Mr. Wilson was wearing his orthotics but was still experiencing pain. He had a callus on his right foot. He reported that both feet were very painful when he walked. TR 242.

On May 13, 2003, and August 19, 2003, Mr. Wilson reported that he was not wearing his orthotics all the time. He had calluses removed from his right foot during each visit and was advised to wear his orthotics when he walked. TR 241.

On December 9, 2003, Mr. Wilson complained of a painful callus on the bottom of his right foot. He reported that he was wearing his orthotics but not when he was at home. He noted that the insole arch reduction was helpful but that he still experienced pain in other parts of his feet when wearing them. He reported that he had some relief with the Vicodin. Mr. Wilson was advised to wear the orthotics when at home as well. TR 240-241.

On January 7, 2004, Mr. Wilson complained of rectal bleeding and was diagnosed with hemorrhoids. TR 239.

On January 8, 2004, Mr. Wilson had a chest x-ray. The diagnostic impression was:

1.4 cm left basal nodule. A CT scan of the chest is advised for further evaluation.
TR 182.

///

5

On February 9, 2004, Mr. Wilson had a painful callus on the bottom of his right foot that was trimmed without bleeding. He reported that he was wearing his orthotics all the time but he felt that he had a lump in his arch. TR 237-238.

On April 9, 2004, Mr. Wilson had a CT of the thorax. The diagnostic impression was:

> The lesion in the left lower lobe appears to be benign, demonstrating calcification along with no evidence for enhancement or spiculations.

TR 181.

On July 12, 2004, Mr. Wilson had painful calluses on both his feet. He reported that he was not wearing the orthotics because of irritation. He had three calluses trimmed without bleeding. TR 235.

On August 11, 2004, Mr. Wilson was seen for his hyperlipidemia, chronic obstructive pulmonary disease (COPD), and nicotine dependence. He reported that he still had foot pain and had run out of Elavil. The record reflected that his Lovastatin was increased to 40 mg and his Elavil was increased to 75 mg. TR 234-235.

On October 12, 2004, Mr. Wilson had painful callouses on both heels and his right foot. The record stated:

> Deep IPK sub 5 right met head - painful to palpation/ reduction. Deep porokeratotic lesion plantar 5 left met head with pain to palpation. Callus with superficial fissuring sub plantar first met head right with fissured callused skin plantar heels b/1 without bleeding without vesicles or signs of T. Pedis. P/ trimming lesions x 4 with relief without bleeding. Rx: lac-hydrin with 5 refills, for heels and area sub first right met head to prevent future fissuring/infection. RTC x 2 months or sooner if problems.

TR 233.

On October 12, 2004, Mr. Wilson had a chest x-ray which reflected a "minor abnormality." TR 180.

On December 14, 2004, Mr. Wilson had painful calluses on both heels and his right foot. He reported that the lac-hydrin made the cracking go away and that the pain medication made it possible for him to perform his daily activities without severe pain. He had the calluses trimmed without bleeding. TR 230.

On March 1, 2005, Mr. Wilson was assessed with a right inguinal hernia and referred for surgery. He was seen by Podiatry for his foot pain. TR 226-227.

On March 29, 2005, Mr. Wilson had an enlarging right groin mass [hernia] that caused him pain. He was scheduled to have surgery on May 26, 2005. TR 223.

On April 11, 2005, Mr. Wilson reported a painful callus on the bottom of his right foot. The notes stated, "Deep porokeratotic lesion plantar 5 left met head with pain to palpation. Plantar feet without evidence of fissuring or calluses at this time. A/ IPK right foot - painful foot, p/trimming lesions x1 with relief without bleeding." TR 153. Mr. Wilson was prescribed Lac-hydrin and a cane. TR 153.

A May 10, 2005, chest x-ray report reflected a minor abnormality and with no significant interval change or process. TR 148.

On May 26, 2005, Mr. Wilson underwent right inguinal hernia repair with mesh plug and patch. TR 147.

On June 7, 2005, Mr. Wilson reported that his discomfort had been reduced since the surgery and taking Vicodin three times daily. TR 137. Mr. Wilson was taking the following prescriptions: Hydrocodone, Amitriptyline, Atenolol, Lovastatin, Ammonium Lactate, Docusate, Formoterol, and Albuterol. TR 137-138.

On July 13, 2005, Mr. Wilson reported chronic pain in his feet. His active problem list included:

| | |
|---|---|
| Right Inguinal Hernia | March 1, 2005 |
| COPD | March 1, 2005 |
| Brief Depressive React | November 15, 2004 |
| Sleep Disorder Due to a General Med. Condition | August 11, 2004 |
| Hyperlipidemia | April 19, 2004 |
| Nonspecific abnormal findings lung field | April 19, 2004 |
| Hypertension | April 19, 2004 |
| Nicotine Dependence | January 7, 2004 |
| Hemorrhoids | January 7, 2004 |
| Corns, & Callosities | December 9, 2003 |
| Pain, limb | December 9, 2003 |
| Congenital Pes Planus | July 12, 2000 |
| Ankle Enthesopathy | July 12, 2000 |
| Joint Pain -Unspec | March 29, 2000 |

TR 135.

On September 6, 2005, Mr. Wilson reported a painful callus on the bottom of his right foot. He reported that he had been using a cane and that applying the lac-hydrin creme to his heels had helped but that he still needed to use the Vicodin. The treatment notes reflected:

Deep IPK sub 5 right met head - painful to palpation/reduction. Deep porokeratotic lesion plantar 5 left met head with pain to palpation. Plantar first right metatarsal head with callus buildup and some to heels. A/ IPK right foot - painful foot, callus x1, p/trimming lesions x 2 with relief without bleeding.  Lac-hydrin as needed. RTC x 2-3 months or sooner if problems. Consider surgical excision of lesion but patient realizes lesion may still recur. TR 134.

On October 3, 2005, Mr. Wilson was seen for the painful callouses on his feet. He reported that he had undergone two foot surgeries and did not want to have another. TR 132. Laboratory results showed an increase in his lipid panel and he was placed on a trial of Lovastatin at 80 mg and low cholesterol diet. TR 133.

On January 24, 2006, Mr. Wilson foot pain was diagnosed as plantar keratosis. TR 221.

On March 14, 2006, Mr. Wilson had a follow-up appointment regarding his foot pain. He also reported low back pain. His pain score was an 8 out of 10. TR 218.

On March 14, 2006, Mr. Wilson had a CT scan of the spine lumbosacral area. The diagnostic impression was: Multilevel degenerative changes with no acute process. TR 178.

On April 25, 2006, Mr. Wilson had a painful callus on the bottom of his right foot. The callus was trimmed without bleeding. TR 217.

On May 15, 2006, there was improvement in his lipid panel and the hyperlipidemia was better with the Zocor. TR 216-217.

On May 23, 2006, Mr. Wilson had a painful callus on the bottom of his right foot. He reported that he had some relief with Vicodin. His lesions were trimmed with relief. TR 214-215.

On July 20, 2006, Mr. Wilson had pain in both his feet. The diagnosis was intractable plantar keratosis sub fifth met head. The doctor noted that Mr. Wilson may have Morton's neuroma in his left foot. TR 214.

On July 20, 2006, Mr. Wilson had an x-ray of his right foot. The diagnostic impression was:

1.      Apparent old healed fracture of the distal aspect of the right fifth metatarsal bone.
2.      Mild symmetrical Degenerative Joint Disease (DJD).

///

8

3.     No fracture, dislocation, or osteomyelitis.
TR 176.

On August 24, 2006, Mr. Wilson reported pain in his feet. He was diagnosed with intractable plantar keratosis in his right foot and the left foot had a palpable neuroma in the second and third interspace where the metatarsals were compressed. Mr. Wilson declined injections for his neuroma. TR 213.

On August 29, 2006, Mr. Wilson was seen for his plantar fibromas. He had declined the injection at his podiatry appointment and the doctor advised him to try the interventions offered by Podiatry to help with his foot pain. The doctor noted, "patient is dysthymic and feels down." TR 211.

On October 26, 2006, Mr. Wilson reported chronic pain in both feet. The notes reflected:

Right worse than left at site of intractable plantar keratosis. Whole leg hurts on the right. Left it is intrinsic to foot in area of 3rd and fourth digits. PMH of excision of neuroma metatarsal. Popping in 2nd interspace of left foot indicative of neuroma in area.

TR 206. Mr. Wilson received an injection for the neuroma. TR 206.
. . .

On November 15, 2006, Mr. Wilson was still experiencing chronic foot pain. Dr. Kaplan reported:

54 year old Veteran here for follow-up of chronic pain complaints still fixated on foot pains; was seen in Mental Health Clinic for major depression and is still visibly depressed with blunted affect.

TR 201.  The neurological exam revealed: "Antalgic gait; uses a cane for support; affect is very blunted and mood depressed." Mr. Wilson was diagnosed with plantar neuroma. TR 201.

(Pl.'s Mot. at 5-12).

The court notes Plaintiff's first mental health consult with Nurse Practitioner (NP) Denney was on September 26, 2006.  During that consultation, Plaintiff stated his chief complaint was that he isolates in his house and has thoughts of dying daily, that he does not care about anything, and he just wants to be left alone.  He had chronic pain, which he stated was only marginally controlled.  His dysfunctional and traumatic childhood was noted, including his polysubstance abuse.  It was noted that ten years prior he had been hospitalized "for a 51-50" for

threatening to kill his in-laws.  The Prozac Dr. Kaplan had prescribed two weeks prior had

improved his mood slightly.  NP Denney noted that Plaintiff had relatively light alcohol use for

about two years, "only two beers today," but that he smokes approximately two grams of

marijuana a day.  (CAR 207).  His past substance abuse included alcohol, moderate

methamphetamine use, as well as glue, hash, LSD, STT, angel dust, Dexedrine, and Seconal,

most of which was apparently used in his teen years.

The mental status exam noted:

Alert, adequate dress, grooming.  He is a bit disheveled.
He has a ponytail and a rather thinnish beard.  He is cooperative.
Mild motor hyperactivity.  Affect is bland to almost blunted.  He is
somewhat disgruntled, especially about pain control issues.
Attention and concentration are intact.  He is fully oriented.
Thought processes are coherent, goal directed, logical.  Thought
process positive for persistent suicidal ideation.  There is no
homicidal ideation, delusions or hallucinations.  Some period
auditory hallucinations.  He states, "I hear music and people
talking."  Questionable insight, mood definitely depressed. (CAR
209).

Plaintiff reported his sleep is okay in general.  NP Denney's diagnosis was:

| | |
|---|---|
| AXIS I: | Major depressive episode, recurrent, marijuana dependence, history of rather severe polysubstance abuse and dependence. |
| AXIS II: | Antisocial traits. |
| AXIS III: | See above. |
| AXIS IV: | Some definite psychosocial environmental problems including economic problems, housing problems, problems with primary support group, occupational problems and problems relating to the social environment.  I would describe his psychosocial environmental problems as moderately severe. |
| AXIS V: | Current GAF 40. |

(CAR 201).  NP Denney adjusted his medication, and set a follow up in four weeks.

Plaintiff further summarized his treatment records regarding his mental health

visits with NP Denney as follows:

On November 6, 2006, Mr. Wilson was seen by NP
Denney. Mr. Wilson reported that the Venlafaxine made him a
little more active. TR 202. The notes reflected that Mr. Wilson
remained blunted and depressed. He was diagnosed with major
depressive episode and his Venlafaxine was increased to 225 mg.

TR 203.

. . .

On January 4, 2007, Mr. Wilson reported very little change in his symptoms since the increase in Venlafaxine. The record reflected that he was:

> still depressed, still unmotivated, and still in pain. The actual addition of Gabapectin was helpful for foot pain at night.

TR 199. NP Denney's assessment was depression and chronic pain. TR 199.

On February 1, 2007, Mr. Wilson had a mental health appointment with NP Denney. Mr. Wilson reported that he had no improvement in his symptoms, was still isolating, and "just gave up on everything." TR 264. He reported to NP Denney that he was seeing and hearing things. The notes reflected that he stated, "I see things out of the corner of my eyes," and "I hear music far off and people talking." TR 264. Mr. Wilson reported that he had turned over many responsibilities to his wife. NP Denney observed that Mr. Wilson was:

> Alert. Appropriate dressing and grooming. Lethargic. Unmotivated. He picked calluses off of his hands during the entire interview and he was unable to control this behavior. Affect is sad and bland. Attention and concentration are intact. He is fully oriented. Language is spontaneous but monotone. Some paucity of thought. No current evidence he is attending to any internal stimuli. Questionable insight. Mood definitely depressed.

TR 264

Mr. Wilson was assessed with 1) Major Depressive Disorder with psychotic features, 2) Mixed personality disorder, and 3) Some obsessive compulsive traits. He was given a prescription for Risperidone to be taken at bedtime. TR 264.

On March 5, 2007, Mr. Wilson reported no improvement with Risperidone as far as seeing things, but felt improvement in his depressive symptoms. He was assessed with major depressive episode, recurrent with psychotic features, obsessive compulsive traits, and mixed personality disorder. His prescription for Venlafaxine was decreased due to blood pressure concerns and he was given a prescription for Bupropion. TR 261.

On April 20, 2007, Mr. Wilson was still very depressed. He reported that he did not know if the change in his prescriptions was helpful. He reported that he had "long ongoing thoughts of killing people who put him down." TR 260. He noted that these thoughts had been with him since his childhood but had no specific person

or method in mind to hurt anyone. His suicidal ideation also continued. Mr. Wilson reported that he had been molested from age 12 to 13 by a male in his late 20's and the suicidal thoughts began after that relationship ended. NP Denney observed:

> This is an alert, somewhat disheveled, cooperative male. Slow psychomotor continues. Affect is bland to almost blunted. Cognitive status is at baseline. No current evidence of a thought disorder. Some insight. Mood remains very depressed with significant anger and irritability.

TR 260. Mr. Wilson's Risperidone was increased and he was scheduled for a follow-up appointment in two to three weeks. TR 260.

(Pl.'s Mot. at 12-13).

## B.    EVALUATIONS

Psychiatric Evaluation, July 7, 2005

At his psychiatric evaluation with Dr. Roux, Plaintiff presented his chief complaints as depression, anxiety and past problems with alcohol and drug addiction.  He claims he had problems with depression since adolescence, which has fluctuated in severity over the years, increasing in severity over the past 10 to 15 years.  He attributed this to chronic pain and other health problems resulting in an inability to work, his financial difficulties, his wife's disabilities, and his sobriety.  He reported his symptoms to include dysphoria and/or irritability, amotivation, anergia, social isolation, disinterest, poor concentration, disrupted sleep, worthlessness and guilt, pessimism and ruminative worries, suicidal ideation, and substance use.

He describes his anxiety as social anxiety, panic and PTSD symptoms.  He stated he does not like to be around a lot of people, has occasional stress-induced anxiety attacks, but no associated agoraphobic avoidance.  Plaintiff also acknowledged an extensive history of substance use, including daily drinking and/or drug use (methamphetamine, cocain, uppers and downers, hallucinogens).  He did attend a court-mandated program eleven years prior and has been clean and sober since, except sometimes a glass of wine and smoking marijuana every day to help his pain, anxiety and sleep problems.  No improvement was noticed in his depression or anxiety since becoming sober, it probably worsened.  However, Plaintiff acknowledged he did not seek

mental health treatment until a couple of years ago.  Since then, he has been on amitriptyline, which has helped his ability to sleep, mood and anxiety.

Plaintiff lives with his wife of over 30 years and has three grown children, all of whom he gets along with fairly well.  He also has a couple of supportive friends.  His wife is disabled; she is partially paralyzed from a car accident.  He is her in-home health service provider, and is paid as such for about thirty hours per week.  He reported he left his previous job, as a part time truck driver, because of his own physical pain and concentration difficulties as well as his need to help his wife.  He also was previously a long haul trucker, a position he had to quit due to his physical problems.  He had always gotten along well with coworkers, superiors, and customers.

Plaintiff reported he takes care of his own activities of daily living as well as the majority of the household chores and errands.  He assists his wife with her needs.  He does have to pace himself and take frequent rest breaks because of his physical pain and fatigue, but he denied that his depression or anxiety significantly interfere with abilities to tend to his responsibilities.  He does not have any hobbies outside of the home, does not socialize but is still able to get along with others okay.  He is capable of driving and leaving the house on his own, but limits himself due to his physical pain, the sedative effects of his medications, and his depression and anxiety.

During the examination, he appeared to be in some physical discomfort, but in no acute distress.  He did not appear to be under the influence of alcohol or other intoxicants.  "Because of a combination of his physical discomfort, concentration difficulties, and dysphoria - he has some problems offering information spontaneously . . . .  He nonetheless puts forth what appears to be a fair effort in the questions and tasks asked of him, and overall come across as being genuine and truthful.  (CAR 117-18).

His thought processes were somewhat impoverished and significantly circumstantial.  There was no evidence of hallucinations, delusions, or dissociate (or other acute

13

PTSD) phenomena.  His mood was somewhat stressed, his affect was somewhat constricted and worried, and he demonstrated a mixture of mild psychomotor restlessness and moderate psychomotor slowing.  He was frequently distracted, causing him to lose his train of thought and it was difficult to redirect him.  However, he was able to understand all of the information presented to him.  His insight and judgment were adequate.

Dr. Roux stated Plaintiff's Axis I diagnosis was: "1.  Major depressive disorder, recurrent (versus chronic), moderate to severe;  2.  Anxiety disorder, not otherwise specified (with social phobia, panic, and PTSD symptoms);  3.  History of polysubstance dependence - in sustained full remission."  His Axis IV diagnosis was: "Psychosocial stressors over the past year: Chronic physical pain/fatigue; inability to work or engage in other previously enjoyed activities; wife's disability; fixed income."  His current GAF was 40 to 45.  (CAR 120)

Dr. Roux noted the above diagnosis was consistent with her findings.

> Assuming he is being truthful about his sobriety, substance use does not appear to be playing an active contributory role into his current psychiatric symptoms.  Despite being on amitriptyline (albeit at a relatively low dose), he continues to demonstrate a number of depression and anxiety symptoms, which - especially when combined with his chronic physical pain, and other stressors - would likely have some negative impact upon his ability to obtain or maintain gainful employment.  However, the claimant himself feels that the main reasons he is not working are his own physical pain and his wife's needs - and were it not for these, he would probably still be employed (and not experiencing significant depression and/or anxiety).  (CAR 120-21).

Dr. Roux opined that "with adequate and appropriate treatment" it was possible that Plaintiff would have some reduction in his depression and anxiety, assuming he was able to maintain his sobriety.  His overall prognosis, however, appeared to only be fair due to all his physical and psychiatric issues.  She assessed Plaintiff with the following limitations:

> 1.  Mildly impaired in his ability to understand, remember, and carry out simple one or two-step job instructions.
> 2.  Moderately impaired in his ability to do detailed and complex instructions.
> 3.  Mildly to moderately impaired in his ability to relate and interact with supervisors, coworkers and the public.

///

14

4.  Moderately to severely impaired in his ability to maintain concentration and attention, persistence and pace.

5.  Moderately impaired in his ability to associate with day-to-day work activity, including attendance and safety.

6.  Moderately impaired in his ability to adapt to the stresses common to a normal work environment.

7.  Moderately to severely impaired in his ability to maintain regular attendance in the work place and perform work activities on a consistent basis.

8.  Moderately impaired in his ability to perform work activities without special or additional supervision.  (CAR 121-22).

Orthopedic Consultative Examination, July 16, 2005

Plaintiff reported his chief complaint was bilateral lower extremity joint pain and lower back pain.  He reported his history included fractures of the right lower extremity several times throughout his childhood.  While in the military, he had increased lower extremity pain and bilateral feet pain, for which he received arch supports.  He again had increased pain in both feet as a truck driver.  He received ibuprofen for pain relief, arch supports, and had surgery several times, some of which did not improve his symptoms.  He had surgery to remove a neuroma, correct hammertoe, and had trimming of calluses periodically.  He also received Vicodin and Elavil for pain, which helped somewhat.  He stated he has constant bilateral sharp throbbing pain in both feet, which can radiate to the proximal lower extremity joints.  He also claimed he has back pain, which is sharp and throbbing, and is aggravated with standing, walking, bending, and lifting.  He stated he can walk up to 200 feet, and uses a cane.

Plaintiff reported working as a truck driver, up to one-and-half years prior.  He smoked two packs of cigarettes per day and drinks occasionally.  "He is independent in all activities of daily living and he is able to drive."  (CAR 125).  Upon examination, he was not found to have any atrophy of the upper or lower extremity muscles.  His gait was normal, he had the ability to toe and heel walk.  The examiner noted he used no assistive device to ambulate.  His range of motion was within normal limits in all areas.

Examination of both feet, the claimant has flexible pes planus. When he is nonweightbearing, he has normal arch and there is no evidence of tarsal tunnel syndrome.  The claimant reported pain on

palpitation over the middle of the arch and some pain at the metatarsal heads.  There was no deformity.  No calluses.  No heel tenderness.  No tenderness in the Achilles tendon.  There is a scar on the lateral aspect of the right foot, which has healed.  (CAR 127).

Plaintiff's motor strength was 5/5 in the upper and lower extremities. He had normal sensation in all dermatomes of the upper and lower extremities bilaterally.

On physical exam, his gait is nonantalgic.  He is able to take a few steps on heels and toes.  He is able to walk with assistive device.  Cervical and lumbar spine range of motion is normal.  When he bends forward, fingertip touches the toes.  No paraspinal tenderness.  Rest of the upper and lower extremity exam does not reveal any joint pathology.  Examination of both ankles shows full range of motion without any joint tenderness.  Examination of both feet does not reveal any significant deformity and he had no specific area of tenderness.  Some tenderness is noted in the middle of the arch and the metatarsal heads.  No deformity is noted.  No evidence of tarsal tunnel syndrome.  The claimant has normal pedal pulse.  Normal sensation in both feet.  There is no neurological deficit.  The claimant's bilateral knee exam and hip exam does not reveal any joint pathology and there was no ligamentous laxity in the knee. (CAR 128).

The examiner found that while Plaintiff has multiple subjective complaints, there were no objective findings, and no limitations found.

RFC - Mental

Completed by an agency physician, it was noted that Plaintiff had marked limitations in his abilities to understand, remember and carry out detailed instructions, and to interact appropriately with the general public.  He was not noted to be significantly limited in any other category.  It was found the Plaintiff was primarily limited by his physical impairments.  It was further noted that he did show mild to moderate depression, but that was not significant in light of his abilities to deal with daily living, "thus the adverse MSS is inconsistent with the objective evidence."  (CAR 159).

Psychiatric Review Technique Form, January 30, 2006

Review found Plaintiff had Depressive disorder, not otherwise specified.  He was rated as having moderate limitations in his abilities regarding activities of daily living,

maintaining social functioning, and maintaining concentration, persistence or pace.

## C.   HEARING TESTIMONY

The administrative hearing was held on March 5, 2007.  Plaintiff, who was represented by an attorney at the proceedings, was the only one to testify.  Plaintiff testified that he was 54 years old, lives with his wife who is disabled due to partial paralyzation and brain damage.  He has a sixth grade education, with no GED.  Plaintiff was in the Marine Corps from 1971 to 1973, from which he received a general discharge under honorable conditions.  He is receiving a thirty percent disability from the Marine Corp due to his feet.

In regards to his past work, Plaintiff testified he worked as a janitor, cleaning a school. He was unsure how many pounds he would have to lift in that job, but he would have to move desks and furniture.  He left the school job due to his feet; he had surgery while working there and the pain was getting too bad.  He drove a flat bed truck, during which he would lift 50 to 100 pounds sometimes.  He also worked as a counselor at a group home for teenage kids.  He worked the night shift, while the kids were asleep, "so I sat and watched TV."  (CAR 272).  He also drove a flat bed truck locally, which did not require any lifting.  He continues to receive "IHSS for wife," for which he is compensated for spending about an hour and fifteen minutes a day, 41.9 hours a month.  The last job he worked at was the flatbed truck job in 2004.  He stopped working at that job because he needed to be at home to take care of his wife.  However, he stated he would not still be working at the flatbed truck even if his wife had not been in the accident.

As to his daily living activities, Plaintiff helps change the sheets on the bed, helps do the laundry, vacuums, and helps mop the floor.  He cooks maybe seven meals a week.  He also mows the lawn with his riding lawn mower, but only does it a couple of times a year.  He does not play any sports, fish, camp or have any hobbies.  He does not exercise, only walking to check the mail.  He does not have any male friends he socializes with, but his daughter comes by to visit.  He likes to buy old books at the secondhand store, which he tries to read "if I can keep

1    my mind clear enough." (CAR 275).

2           Plaintiff takes hydrocodone for pain four times a day.  He takes Risperdal "for

3    thoughts." (CAR 276).  He also takes medication for his mood, depression.  He does not use

4    street drugs, but did fifteen years ago or so.  He testified he smokes marijuana a couple of times a

5    week, "sometimes it's daily, and sometimes it's not." (CAR 277).  He also used alcohol in the

6    past, probably fifteen years ago or more.

7           When asked by his attorney for the primary reason he cannot work, he stated it

8    was due to the pain in his feet, "I can't stand to stand on them." (CAR 278).  He also testified

9    that his knee buckles, his back hurts, he runs out of breath easily, and his legs feel weak.  He also

10   has trouble sleeping.  The pain in his feet started when he was young, stemming from breaking

11   some bones.  He continues to receive ongoing treatment for his foot pain, including five

12   operations which have not been successful.  He also received a shot of cortisone, which did not

13   help, and actually made it worse.  He has the corns cut off his feet.  He cannot walk a full city

14   block without stopping.  He can walk some, take a short break and probably walk some more.

15   He received a cane for his knee by Dr. Fleming.  He has never fallen from his knee buckling, but

16   has come close.  The pain in his back is down the lower back.  It is there most of the time.  "Just

17   leaning over doing dishes, my back hurts." (CAR 280).  However, there are not many times

18   when the pain is so bad he can't finish the dishes.  Doing the dishes takes ten to fifteen minutes.

19   He is on two inhalers for his breathing problem, COPD.  He also has markings on his lungs, for

20   which he has x-rays taken every couple of months.

21          He goes to sleep about eight at night, and usually sleeps for about four or five

22   hours.  He usually gets up in the middle of the night once, sometimes twice.  He has some mild

23   trouble with osteoarthritis but is not taking any medication for it.  He can climb stairs.

24                          **III.  STANDARD OF REVIEW**

25          The court reviews the Commissioner's final decision to determine whether it is:

26   (1) based on proper legal standards; and (2) supported by substantial evidence in the record as a

18

whole.  See Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir. 1999).  "Substantial evidence" is more than a mere scintilla, but less than a preponderance.  See Saelee v. Chater, 94 F.3d 520, 521 (9th Cir. 1996).  It is "such evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 402 (1971).  The record as a whole, including both the evidence that supports and detracts from the Commissioner's conclusion, must be considered and weighed.  See Howard v. Heckler, 782 F.2d 1484, 1487 (9th Cir. 1986); Jones v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985).  The court may not affirm the Commissioner's decision simply by isolating a specific quantum of supporting evidence.  See Hammock v. Bowen, 879 F.2d 498, 501 (9th Cir. 1989).  If substantial evidence supports the administrative findings, or if there is conflicting evidence supporting a particular finding, the finding of the Commissioner is conclusive.  See Sprague v. Bowen, 812 F.2d 1226, 1229-30 (9th Cir. 1987).  Therefore, where the evidence is susceptible to more than one rational interpretation, one of which supports the Commissioner's decision, the decision must be affirmed, see Thomas v. Barnhart, 278 F.3d 947, 954 (9th Cir. 2002), and may be set aside only if an improper legal standard was applied in weighing the evidence, see Burkhart v. Bowen, 856 F.2d 1335, 1338 (9th Cir. 1988).

## IV.  DISCUSSION

Plaintiff argues the ALJ erred in three ways: (1) the ALJ rejected the psychiatric opinions of the consulting and treating sources; (2) the ALJ rejected statements as to Plaintiff's pain and functional limitations; and (3) the ALJ failed to obtain the testimony of a vocational expert.

### A.    MEDICAL OPINIONS

Plaintiff's first claim is that the ALJ erred in rejecting the opinions of the consulting and treating psychiatric medical opinions.  He claims the consultative examiner found he suffered from a major depressive disorder, an anxiety disorder, past polysubstance dependency, and a low GAF of 40-45.  The consultative examiner found Plaintiff's abilities were

impaired, which the ALJ acknowledged but rejected as not supported by Plaintiff's own statements.  Instead, the ALJ credited a non-treating, non-examining physician opinion, who determined Plaintiff retains the ability to perform unskilled work with limited public contact. The ALJ rejected the examining physician's opinion without a legitimate basis for doing so.

In addition, Plaintiff argues that the ALJ erroneously rejected the opinion of his treating medical professional, a psychiatric nurse practitioner. The nurse practitioner assessed Plaintiff with major depressive episode, marijuana dependence, antisocial traits and a GAF of 40. The ALJ failed to address the nurse practitioner's opinion, who began treating Plaintiff after the non-examining physician's assessment.

Defendant argues in response that the ALJ properly discounted the consultative examiner's opinion, in favor of the non-examining physicians' opinion.  He argues the ALJ's reliance on the non-examining physicians' opinions was justified under Roberts v. Shalala, 66 F.3d 179 (9th Cir. 1995).  Specifically, the non-examining physicians found the opinion of the examining physician was inconsistent with the benign mental status findings and Plainff's daily activities.  As to Plaintiff's argument regarding his treating nurse practitioner, Defendant argues that Plaintiff himself acknowledges that a nurse practitioner is not an acceptable medical source under the regulations, so his opinion is not entitled to controlling weight as a medical opinion. In addition, the nurse practitioner did not offer any specific opinions as to Plaintiff's functional abilities, so there was no opinion for the ALJ to evaluate.  Further, Defendant argues the Plaintiff does not support his contention that the ALJ was required to state what weight he gave the non-medical opinion evidence.  As to Plaintiff's contention that his GAF of 40 supports a finding of disability, the Ninth Circuit has held a GAF of 40 is not disabling, nor is it a medical opinion, synonymous with disability or equivalent to a RFC finding.  See Bayliss v. Barnhart, 427 F.3d 1211, 1217 (9th Cir. 2005); Howard v. Comm'r of Soc. Sec., 276 F.3d 235, 241 (6th Cir. 2002). Finally, although the ALJ did not mention the nurse practitioner by name, he did consider his treatment records and their contents, citing them specifically, and found they established that

1  Plaintiff had a severe mental impairment.

2      The weight given to medical opinions depends in part on whether they are

3  proffered by treating, examining, or non-examining professionals.  See Lester v. Chater, 81 F.3d

4  821, 830-31 (9th Cir. 1995).  Ordinarily, more weight is given to the opinion of a treating

5  professional, who has a greater opportunity to know and observe the patient as an individual,

6  than the opinion of a non-treating professional.  See id.; Smolen v. Chater, 80 F.3d 1273, 1285

7  (9th Cir. 1996); Winans v. Bowen, 853 F.2d 643, 647 (9th Cir. 1987).  The least weight is given

8  to the opinion of a non-examining professional.  See Pitzer v. Sullivan, 908 F.2d 502, 506 & n.4

9  (9th Cir. 1990).

10      In addition to considering its source, to evaluate whether the Commissioner

11  properly rejected a medical opinion the court considers whether:  (1) contradictory opinions are

12  in the record; and (2) clinical findings support the opinions.  The Commissioner may reject an

13  uncontradicted opinion of a treating or examining medical professional only for "clear and

14  convincing" reasons supported by substantial evidence in the record.  See Lester, 81 F.3d at 831.

15  While a treating professional's opinion generally is accorded superior weight, if it is contradicted

16  by an examining professional's opinion which is supported by different independent clinical

17  findings, the Commissioner may resolve the conflict.  See Andrews v. Shalala, 53 F.3d 1035,

18  1041 (9th Cir. 1995).  A contradicted opinion of a treating or examining professional may be

19  rejected only for "specific and legitimate" reasons supported by substantial evidence.  See Lester,

20  81 F.3d at 830.  This test is met if the Commissioner sets out a detailed and thorough summary of

21  the facts and conflicting clinical evidence, states her interpretation of the evidence, and makes a

22  finding.  See Magallanes v. Bowen, 881 F.2d 747, 751-55 (9th Cir. 1989).  Absent specific and

23  legitimate reasons, the Commissioner must defer to the opinion of a treating or examining

24  professional.  See Lester, 81 F.3d at 830-31.  The opinion of a non-examining professional,

25  without other evidence, is insufficient to reject the opinion of a treating or examining

26  professional.  See id. at 831.  In any event, the Commissioner need not give weight to any

1   conclusory opinion supported by minimal clinical findings.  See Meanel v. Apfel, 172 F.3d 1111,

2   1113 (9th Cir. 1999) (rejecting treating physician's conclusory, minimally supported opinion);

3   see also Magallanes, 881 F.2d at 751.

4           Here, the ALJ discussed the medical evidence in some detail.  Based on the

5   medical evidence in the record, including Plaintiff's mental status examinations with NP Denney,

6   the ALJ determined Plaintiff had been diagnosed with a major depressive disorder, marijuana

7   dependence and an anxiety disorder, which he determined to be severe.  As to Plaintiff's

8   limitations, the ALJ found Plaintiff was only mildly to moderately limited by his mental

9   impairments as to his activities of daily living.  He supported this determination based on his

10  ability to care for his disabled wife, performance of the majority of household chores and running

11  errands independently, as well as his statements to the CE and statements in the record from a

12  third party.  The undersigned notes this determination is not inconsistent with the CE's finding

13  that he is moderately limited in his daily work activity, or the agency physician the ALJ credited.

14          As to Plaintiff's social functioning, the ALJ determined he is moderately limited.

15  This is supported by Plaintiff's ability to maintain relationships, and perform errands with at least

16  a superficial interaction with others.  Again, this determination is not inconsistent with the CE.

17          In the area of Plaintiff's abilities related to persistence, concentration or pace, the

18  ALJ found Plaintiff to be moderately limited.  This contradicts the CE's finding that Plaintiff is

19  moderately to severely limited in this area.  The ALJ supported this determination by statements

20  in the record from Plaintiff's daughter, the CE's examination results where Plaintiff was able to

21  perform serial sevens and calculations slowly but accurately, that he was oriented and his

22  attention and concentration were intact at his September 26, 2006, mental status evaluation with

23  NP Denney.  In addition, the ALJ noted that the CE found Plaintiff only mildly impaired in his

24  ability to perform simple one or two step instructions.

25  / / /

26  / / /

1    The ALJ specifically addressed the CE's determination of Plaintiff's abilities

2 stating:

3            In reaching the foregoing determination, the undersigned
     accorded significant weight to the opinions the state agency
4    physicians who determined the claimant retains the ability to
     perform unskilled work with limited contact.  This determination is
5    consistent with the remainder of the record, which documents
     limited medical treatment for depression or anxiety.  Moreover, the
6    claimant remains independent in activities of daily living and
     reported to the consultative examiner that he would still be
7    employed despite his mental health history.  He stated the main
     reasons for his disability were his wife's illness and physical pain
8    rather than his depressive symptomology.  The undersigned
     acknowledges the examiner concluded the claimant was
9    moderately to severely impaired in his ability to maintain
     concentration, attention, persistence and pace and in his ability to
10   perform work activities on a consistent basis.  However, these
     conclusions are not supported by the claimant's own statements
11   that he would be employed if not for his physical pain and his
     wife's injuries.  Moreover, the mental status examination
12   conducted by the examiner demonstrated rather benign findings
     which do not support the severity of the limitations proposed by
13   the examiner.  The undersigned also notes the claimant has not
     engaged in regular group or individual counseling; he has not been
14   hospitalized for his mental health symptoms and there is no
     evidence of any severe findings on mental status examinations of
15   the claimant.  The claimant has been maintained on medications
     for depression and he reported the regimen has helped his
16   symptoms.  Thus, the conclusions rendered by the consultative
     examiner appear contrary to the claimant's own statements and the
17   benign findings on mental status examinations.  Therefore, the
     determinations made by the examiner were given little weight.  The
18   undersigned also notes the consultative examiner noted the
     claimant smoked marijuana on a daily basis but made no diagnosis
19   of marijuana dependence or the effect of his drug use on his ability
     to function.  For these reasons, the opinion of the consultative
20   examiner was given little weight.  (CAR 23).

21   The undersigned finds the ALJ set forth specific reasons for according the CE's

22 opinion little weight, and that these reasons are supported by the record.  Plaintiff first objects to

23 the ALJ's finding that Plaintiff stated "he would be employed if not for his physical pain and his

24 wife's injuries."  However, the undersigned notes that is what the CE reported.  (CAR 120).  He

25 also testified, as the ALJ noted, that the primary reason he cannot work is because his "feet get to

26 hurting so bad, I can't stand to stand on them."  He further testified about his knee buckling,

1    running out of breath, and his legs feel weak.  He did not state during his testimony that he could

2    not work due to his mental status.

3            Plaintiff also objects to the ALJ crediting a non-examining physician's opinion

4    over the examining physician.  However, the Ninth Circuit has stated that "giving the examining

5    physician's opinion *more* weight than the nonexamining expert's opinion does not mean that the

6    opinions of nonexamining sources and medical advisors are entitled to *no* weight."  Andrews v.

7    Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995) (emphasis in original).  Indeed, the Court explained

8    that "when it is an *examining* physician's opinion that the ALJ has rejected in reliance on the

9    testimony of a nonexamining advisor, reports of the nonexamining advisor need not be

10   discounted and may serve as substantial evidence when they are supported by other evidence in

11   the record and are consistent with it."  Id.  Such is the case here, and the undersigned finds no

12   error in the ALJ relying on the opinion of the nonexamining physician, especially as the only

13   major disagreement was regarding Plaintiff's concentration, attention, persistence and pace

14   abilities.  The undersigned notes that the ALJ's determination is also supported by the CE's

15   failure to address Plaintiff's daily marijuana use.[2]  The ALJ was only required to set forth

16   specific reasons for disregarding the conflicting observations, opinion and conclusions.  The

17   undersigned finds he did so, and his decision was supported by substantial evidence.

18           **B.     PAIN TESTIMONY**

19           Plaintiff next argues that the ALJ erred in rejecting his testimony and third party

20   statements regarding his pain and functional limitations without clear and convincing reasons for

21

22           [2]     While not specifically raised, the undersigned notes that if drug or alcohol use is a
     contributing factor material to a determination of disability, an individual is not entitled to
23   benefits.  See 20 C.F.R. §§ 404.1535 and 416.945; see also Sousa v. Callahan, 143 F.3d 1240,
     1245 (9th Cir. 1998).  The burden is on the plaintiff to demonstrate that drug and alcohol
24   addiction is not a material factor by showing that an impairment would have been disabling even
     if drug and alcohol use ceased.  See Parra v. Astrue, 481 F.3d 742, 748 (9th Cir. 2007).  To do
25   so, the plaintiff would have to demonstrate that the impairment "would remain during periods
     when she stopped using drugs and alcohol."  See Ball v. Massanari, 254 F.3d 817, 821 (9th Cir.
26   2001) (citing Sousa, 143 F.3d at 1245).

1    doing so.

2              1.      Plaintiff's Testimony

3              The Commissioner determines whether a disability applicant is credible, and the

4    court defers to the Commissioner's discretion if the Commissioner used the proper process and

5    provided proper reasons.  See Saelee v. Chater, 94 F.3d 520, 522 (9th Cir. 1996).  An explicit

6    credibility finding must be supported by specific, cogent reasons.  See Rashad v. Sullivan, 903

7    F.2d 1229, 1231 (9th Cir. 1990).  General findings are insufficient.  See Lester v. Chater, 81 F.3d

8    821, 834 (9th Cir. 1995).  Rather, the Commissioner must identify what testimony is not credible

9    and what evidence undermines the testimony.  See id.  Moreover, unless there is affirmative

10   evidence in the record of malingering, the Commissioner's reasons for rejecting testimony as not

11   credible must be "clear and convincing."  See id.; see also Carmickle v. Commissioner, 533 F.3d

12   1155, 1160 (9th Cir. 2008) (citing Lingenfelter v Astrue, 504 F.3d 1028, 1936 (9th Cir. 2007),

13   and Gregor v. Barnhart, 464 F.3d 968, 972 (9th Cir. 2006)).

14             If there is objective medical evidence of an underlying impairment, the

15   Commissioner may not discredit a claimant's testimony as to the severity of symptoms merely

16   because they are unsupported by objective medical evidence.  See Bunnell v. Sullivan, 947 F.2d

17   341, 347-48 (9th Cir. 1991) (en banc).  As the Ninth Circuit explained in Smolen v. Chater:

18             The claimant need not produce objective medical evidence of the
             [symptom] itself, or the severity thereof.  Nor must the claimant produce
19           objective medical evidence of the causal relationship between the
             medically determinable impairment and the symptom.  By requiring that
20           the medical impairment "could reasonably be expected to produce" pain or
             another symptom, the Cotton test requires only that the causal relationship
21           be a reasonable inference, not a medically proven phenomenon.

22   80 F.3d 1273, 1282 (9th Cir. 1996) (referring to the test established in Cotton v. Bowen, 799

23   F.2d 1403 (9th Cir. 1986)).

24             The Commissioner may, however, consider the nature of the symptoms alleged,

25   including aggravating factors, medication, treatment, and functional restrictions.  See Bunnell,

26   947 F.2d at 345-47.  In weighing credibility, the Commissioner may also consider: (1) the

1   claimant's reputation for truthfulness, prior inconsistent statements, or other inconsistent

2   testimony; (2) unexplained or inadequately explained failure to seek treatment or to follow a

3   prescribed course of treatment; (3) the claimant's daily activities; (4) work records; and (5)

4   physician and third-party testimony about the nature, severity, and effect of symptoms.  See

5   Smolen, 80 F.3d at 1284 (citations omitted).  It is also appropriate to consider whether the

6   claimant cooperated during physical examinations or provided conflicting statements concerning

7   drug and/or alcohol use.  See Thomas v. Barnhart, 278 F.3d 947, 958-59 (9th Cir. 2002).  If the

8   claimant testifies as to symptoms greater than would normally be produced by a given

9   impairment, the ALJ may disbelieve that testimony provided specific findings are made.  See

10  Carmickle, 533 F.3d at 1161 (citing Swenson v. Sullivan, 876 F.2d 683, 687 (9th Cir. 1989)).

11          Here, the ALJ stated:

12          While the claimant testified to several physical impairments
            including pain in the knees, back, feet, chest and legs, there is no
13          evidence of an impairment in this case that could reasonably
            produce the levels of pain alleged by the claimant.  Films of the
14          lumbar spine have demonstrated only mild degenerative findings
            and no specific treatment has been rendered for his complaints.  In
15          addition, while radiographs have demonstrated constructive
            pulmonary disease, there is no evidence of shortness of breath or
16          other symptoms related to this finding.  Although the claimant
            testified to severe bilateral feet pain, the claimant has been treated
17          for these complaints since 1998 and he was able to maintain work
            activities despite his subjective reports of pain.  There is no
18          evidence of worsening of his pain or evidence of an impairment
            affecting the feet that could produce the severity of the symptoms
19          alleged.  Since the record fails to document any impairment that
            could reasonably cause severe pain, pursuant to Social Security
20          Rulings 96-3p and 96-4p, his testimony regarding his limitations
            cannot be accepted.
21          While the claimant testified to depression, anxiety and
            suicidal thoughts, the undersigned concludes an accommodation to
22          unskilled work would adequately accommodate the claimant's
            affective disorder.  The record shows the claimant is able to
23          maintain a household and care for a disabled wife, which clearly
            demonstrates an ability to maintain the persistence and pace for
24          regular work activities.  The claimant has admitted that his
            depressive symptoms would not interfere with his ability to work.
25          Despite the claimant's allegations of difficulty interacting with
            others, the record demonstrates he is able to shop in public and
26          perform errands in public.  In any event, unskilled work involves

1  repetitive tasks with data rather than working with people.  Thus,
2  while the claimant's subjective complaints were considered, the
   undersigned concludes his limitations would be accommodated by
3  a restriction to unskilled work with limited public contact.  (CAR
   24).

4       Plaintiff argues the ALJ erred in disregarding his testimony as to his pain, and

5  limitations in that the level of activity Plaintiff testified to does not evidence an ability to engage

6  in work activities.  In addition, he argues that the ALJ erred in disregarding Plaintiff's ongoing,

7  worsening, severe foot impairments and pain, and that he trivialized Plaintiff's severe

8  impairments.  Plaintiff also argues the ALJ erred in his finding that he suffered no severe

9  physical impairments at step two.

10      As to the severity of Plaintiff's physical impairments, the ALJ discussed his

11 physical ailments including his feet, back, and obstructive pulmonary disease.  The ALJ found

12 none of these to be severe due to the lack of objective medical findings of an impairment which

13 would limit his ability to perform work activities, lack of treatment, and minor diagnostic testing.

14 The ALJ also found Plaintiff's foot condition has not had more than a minimal effect on his

15 ability to perform work activities, especially as he has had the condition since 1998 and was able

16 to maintain work activities as a janitor and truck driver during that time period.  The ALJ noted

17 that while treatment of his condition continued, the treatment received, including removal of the

18 callus formations on his feet, did not occur at a frequency that would not permit work activities,

19 and Plaintiff's treating podiatrist did not provide an opinion that he was unable to work.

20      In order to be entitled to benefits, the plaintiff must have an impairment severe

21 enough to significantly limit the physical or mental ability to do basic work activities.  See 20

22 C.F.R. §§ 404.1520(c), 416.920(c).[3]  In determining whether a claimant's alleged impairment is

23

24       [3]      Basic work activities include: (1) walking, standing, sitting, lifting, pushing,
   pulling, reaching, carrying, or handling; (2) seeing, hearing, and speaking; (3) understanding,
25 carrying out, and remembering simple instructions; (4) use of judgment; (5) responding
   appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes
26 in a routine work setting.  See 20 C.F.R. §§ 404.1521, 416.921.

1 sufficiently severe to limit the ability to work, the Commissioner must consider the combined

2 effect of all impairments on the ability to function, without regard to whether each impairment

3 alone would be sufficiently severe.  See Smolen v. Chater, 80 F.3d 1273, 1289-90 (9th Cir.

4 1996); see also 42 U.S.C. § 423(d)(2)(B); 20 C.F.R. §§ 404.1523 and 416.923.  An impairment,

5 or combination of impairments, can only be found to be non-severe if the evidence establishes a

6 slight abnormality that has no more than a minimal effect on an individual's ability to work.  See

7 Social Security Ruling ("SSR") 85-28; see also Yuckert v. Bowen, 841 F.2d 303, 306 (9th Cir.

8 1988) (adopting SSR 85-28).  The plaintiff has the burden of establishing the severity of the

9 impairment by providing medical evidence consisting of signs, symptoms, and laboratory

10 findings.  See 20 C.F.R. §§ 404.1508, 416.908. The plaintiff's own statement of symptoms alone

11 is insufficient.  See id.

12      Accordingly, the undersigned finds that the ALJ properly considered all of

13 Plaintiff's physical impairments, and did not err is his determination that he had no severe

14 physical condition.  This decision was also supported by the consultative examiner's findings and

15 the state agency physicians' opinions.

16      As to Plaintiff's pain and limitations testimony, the undersigned finds the reasons

17 set forth by the ALJ in discounting Plaintiff's testimony were clear and convincing.  In assessing

18 credibility, the ALJ is permitted to consider inconsistent testimony, Plaintiff's daily activities and

19 his work records.  This is exactly the type of consideration the ALJ used in assessing Plaintiff's

20 testimony.  The ALJ found that his testimony was inconsistent with the treatment he sought and

21 received in that most of his physical limitations were so mild that his treating physicians did not

22 provide any specific treatment for them, especially his back and pulmonary disease.  As for

23 Plaintiff's testimony regarding his feet, the ALJ considered Plaintiff's work records and noted

24 that from 1998 until 2004 Plaintiff was able to continue working despite the conditions affecting

25 his feet, and there was no indiction in the record that his feet condition worsened in 2004.

26 / / /

1    Accordingly the undersigned finds the reasons the ALJ did not accept Plaintiff's

2    testimony are clear and convincing, the ALJ used the proper process and provided proper

3    reasons, and the reasons stated are supported by the record.  The court will not disturb the ALJ's

4    credibility determination.

5         2.    Third Party Statements

6    Plaintiff further alleges the ALJ erred by failing to credit third party testimony.

7    Specifically, Plaintiff argues the ALJ's failed to accurately reflect on his daughter's statements as

8    to his daily activities and failed to provide specific reasons for rejecting her statements.

9    In determining whether a claimant is disabled, an ALJ generally must consider lay

10   witness testimony concerning a claimant's ability to work.  See Dodrill v. Shalala, 12 F.3d 915,

11   919 (9th Cir. 1993); 20 C.F.R. §§ 404.1513(d)(4) & (e), 416.913(d)(4) & (e).  Indeed, "lay

12   testimony as to a claimant's symptoms or how an impairment affects ability to work is competent

13   evidence . . . and therefore cannot be disregarded without comment."  See Nguyen v. Chater, 100

14   F.3d 1462, 1467 (9th Cir. 1996).  Consequently, "[i]f the ALJ wishes to discount the testimony

15   of lay witnesses, he must give reasons that are germane to each witness."  Dodrill, 12 F.3d at

16   919.

17   The ALJ, however, need not discuss all evidence presented.  See Vincent on

18   Behalf of Vincent v. Heckler, 739 F.2d 1393, 1394-95 (9th Cir. 1984).  Rather, he must explain

19   why "significant probative evidence has been rejected." Id. (citing Cotter v. Harris, 642 F.2d 700,

20   706 (3d Cir.1981).  Lay witness testimony which is neither significant nor probative may be

21   properly ignored.  See id. at 1395.  Similarly, third party testimony which is unsupported or

22   controverted by medical evidence may be rejected.  See Bayliss v. Barnhart, 427 F.3d 1211,

23   1218 (9th Cir. 2005).

24   Here, the ALJ stated:

25        A third party also reported the claimant is independent in
         activities of daily living and indicated the claimant assisted his
26        wife, cared for a pet, prepared meals, did the laundry, cleaned the

1     dishes, vacuumed, and handled his financial affairs.  (CAR 22).

2     The ALJ also noted that Plaintiff's "daughter also indicated the claimant got along

3     well with authority figures . . . ."  (CAR 22).  He further found:

4              In the area of persistence, concentration or pace, the
          claimant's daughter indicated the claimant has difficulty with his
5              memory but she reported the claimant could pay attention for short
          periods and follow instructions.  (CAR 22).

6

7     Plaintiff argues these findings failed to accurately reflect the third party

8     observations, and he failed to provide specific reasons for rejecting the statements.  Defendant

9     argues that the ALJ did not disregard the third party statements, and in fact agreed with some of

10    them.  He took into account the statements regarding Plaintiff's limitation in dealing with people

11    by finding him only capable of unskilled work.  Defendant also argues that to the extent the third

12    party statements were inconsistent with the objective evidence, the ALJ properly found them

13    unpersuasive.  Such statements include Plaintiff's difficulties with persistence, concentration and

14    pace, as well as his memory.

15    The ALJ discussed the third party statements as set forth above.  These statements

16    were not specifically rejected.  Rather, the ALJ found they supported his determination that

17    Plaintiff was only moderately restricted in the areas of daily living activities, social functioning,

18    and cognitive abilities.  While Plaintiff argues the ALJ's determination that his daily living

19    activities were greater than as testified to, the undersigned finds that determination is supported

20    by the record.  In addition, the third party statements regarding Plaintiff's limitations in getting

21    along with others and his memory were taken into consideration by the ALJ and similarly not

22    rejected.  The only statement raised by the Plaintiff which was not specifically addressed by the

23    ALJ was his daughter's statement that Plaintiff was limited in his ability to lift greater than

24    fifteen pounds, and has a hard time squatting.  However, these statements were contradicted by

25    the medical evidence, and the ALJ therefore did not err in ignoring them.

26    ///

1    The undersigned finds no error in the ALJ's treatment of the testimony of

2  Plaintiff nor the third party statements.

3    **C.    VOCATIONAL EXPERT**

4    Finally, Plaintiff argues that the ALJ failed to properly assess his RFC, and

5  therefore erred in utilizing the Grids despite his non-exertional impairments and in failing to call

6  a vocational expert to testify at the hearing.

7    1.    Residual Functional Capacity

8    Residual functional capacity is what a person "can still do despite [the

9  individual's] limitations." 20 C.F.R. §§ 404.1545(a), 416.945(a) (2003); see also Valencia v.

10  Heckler, 751 F.2d 1082, 1085 (9th Cir. 1985) (residual functional capacity reflects current

11  "physical and mental capabilities").   In determining residual functional capacity, the ALJ must

12  assess what the plaintiff can still do in light of both physical and mental limitations.  See 20

13  C.F.R. §§ 404.1545(a), 416.945(a) (2003); see also Valencia v. Heckler, 751 F.2d 1082, 1085

14  (9th Cir. 1985) (residual functional capacity reflects current "physical and mental capabilities").

15    Here, as indicated above, the ALJ found Plaintiff had the following RFC:

16    The claimant has the following residual functional capacity
     to perform unskilled work.  In particular the claimant retains the
17    ability to understand, remember and carry out simple one or two-
     step instructions.  The claimant also has the ability to relate and
18    interact with others with limited public contact and he can adapt to
     stresses common to a normal work environment.  The claimant
19    also can maintain concentration, attention, persistence and pace
     and he can maintain regular attendance.  (CAR 25).
20

21    The ALJ further found Plaintiff had no exertional limitations.  He therefore

22  concluded that "considering the range of work at all levels that the claimant is still functionally

23  capable of performing," Plaintiff is not disabled.  (CAR 26).

24    Plaintiff's argument is based on the ALJ's treatment of the medical evidence and

25  testimony discussed above.  The undersigned has found no error in the ALJ's treatment of either,

26  specifically the ALJ did not err in his assessment of the medical opinions nor the credibility of

1   the testimony.  As no error was found above, the court likewise finds no error in the ALJ's

2   determination of Plaintiff's RFC.

3                2.        GRIDS vs. Vocational Expert

4                Finally, Plaintiff argues that the ALJ erred in relying on the Grids instead of

5   calling a vocational expert to testify at the hearing.

6                The Medical-Vocational Guidelines ("Grids") provide a uniform conclusion about

7   disability for various combinations of age, education, previous work experience, and residual

8   functional capacity.  The Grids allow the Commissioner to streamline the administrative process

9   and encourage uniform treatment of claims based on the number of jobs in the national economy

10  for any given category of residual functioning capacity.  See Heckler v. Campbell, 461 U.S. 458,

11  460-62 (1983) (discussing creation and purpose of the Grids).

12               The Commissioner may apply the Grids in lieu of taking the testimony of a

13  vocational expert only when the Grids accurately and completely describe the claimant's abilities

14  and limitations.  See Jones v. Heckler, 760 F.2d 993, 998 (9th Cir. 1985); see also Heckler v.

15  Campbell, 461 U.S. 458, 462 n.5 (1983).  Thus, the Commissioner generally may not rely on the

16  Grids if a claimant suffers from non-exertional limitations because the Grids are based on

17  exertional strength factors only.[4]  See 20 C.F.R., Part 404, Subpart P, Appendix 2, § 200.00(b).

18

19         [4]     Exertional capabilities are the primary strength activities of sitting, standing,
    walking, lifting, carrying, pushing, or pulling and are generally defined in terms of ability to
20  perform sedentary, light, medium, heavy, or very heavy work.  See 20 C.F.R., Part 404, Subpart
    P, Appendix 2, § 200.00(a).  "Sedentary work" involves lifting no more than 10 pounds at a time
21  and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  See 20
    C.F.R. §§ 404.1567(a) and 416.967(a).  "Light work" involves lifting no more than 20 pounds at a
22  time with frequent lifting or carrying of objects weighing up to 10 pounds.  See 20 C.F.R. §§
    404.1567(b) and 416.967(b).  "Medium work" involves lifting no more than 50 pounds at a time
23  with frequent lifting or carrying of objects weighing up to 25 pounds.  See 20 C.F.R. §§
    404.1567(c) and 416.967(c).  "Heavy work" involves lifting no more than 100 pounds at a time
24  with frequent lifting or carrying of objects weighing up to 50 pounds.  See 20 C.F.R. §§
    404.1567(d) and 416.967(d).  "Very heavy work" involves lifting objects weighing more than
25  100 pounds at a time with frequent lifting or carrying of objects weighing 50 pounds or more.
    See 20 C.F.R. §§ 404.1567(e) and 416.967(e).
26         Non-exertional activities include mental, sensory, postural, manipulative, and
    environmental matters which do not directly affect the primary strength activities.  See 20 C.F.R.,

1    "If a claimant has an impairment that limits his or her ability to work without directly affecting

2    his or her strength, the claimant is said to have non-exertional . . . limitations that are not covered

3    by the Grids." Penny v. Sullivan, 2 F.3d 953, 958 (9th Cir. 1993) (citing 20 C.F.R., Part 404,

4    Subpart P, Appendix 2, § 200.00(d), (e)).  The Commissioner may, however, rely on the Grids

5    even when a claimant has combined exertional and non-exertional limitations, if non-exertional

6    limitations do not impact the claimant's exertional capabilities.  See Bates v. Sullivan, 894 F.2d

7    1059, 1063 (9th Cir. 1990); Polny v. Bowen, 864 F.2d 661, 663-64 (9th Cir. 1988).

8           In cases where the Grids are not fully applicable, the ALJ may meet his burden

9    under step five of the sequential analysis by propounding to a vocational expert hypothetical

10   questions based on medical assumptions, supported by substantial evidence, that reflect all the

11   plaintiff's limitations.  See Roberts v. Shalala, 66 F.3d 179, 184 (9th Cir. 1995).  Specifically,

12   where the Grids are inapplicable because plaintiff has sufficient non-exertional limitations, the

13   ALJ is required to obtain vocational expert testimony.  See Burkhart v. Bowen, 587 F.2d 1335,

14   1341 (9th Cir. 1988).

15          Here, the ALJ found:

16          The claimant has only nonexertional limitations.
       Preliminarily, the undersigned notes that a restriction to dealing
17     with things does not prevent the claimant from doing unskilled
       work because, as Social Security Rule 85-15 explains, unskilled
18     work primarily involves dealing with things not people.
       Considering the claimant's residual functional capacity for a full
19     range of unskilled work at all exertional levels and his age, and
       vocational profile, Rule 204.00 of the Medical-Vocational
20     Guidelines, Appendix 2, Subpart P, Regulations No. 4, indicates
       that a finding of "not disabled" is appropriate.
21          The limitation to simple, unskilled work does not
       significantly erode the occupational base available to the claimant.
22     Social Security Rule 83-10 provides that the residual functional
       capacity considered under each rule of the Medical-Vocational
23     Guidelines reflects the presence of nonexertional capabilities
       sufficient to perform unskilled work at the pertinent exertional
24     level. . . . . Furthermore, Social Security Rule 85-15 provides that,
       where there is no exertional impairment, unskilled jobs at all levels

25

26   Part 404, Subpart P, Appendix 2, § 200.00(e).

1    of exertion constitute the potential occupational base for a person
     who can meet the basic mental demand of unskilled work.
2    Therefore, the undersigned concludes that the claimant's ability to
     perform work at all exertional levels is not significantly
3    compromised by his non-exertional limitations . . . . (CAR 24-25).

4          Plaintiff argues that ALJ's findings as to his limitations were not supported by the

5    evidence in the record.  As such, he argues the ALJ erred in relying on the Grids in light of his

6    non-exertional limitations, such as his pain, need for breaks, and concentration.  Therefore, the

7    ALJ was required to utilize the services of a vocational expert to determine whether there were

8    any jobs he was capable of performing .

9          As discussed above, the undersigned has found no error in the ALJ's

10   determination as to Plaintiff's limitations.  Specifically, the ALJ found Plaintiff did not have any

11   exertional limitations.  As to Plaintiff's non-exertional limitations, the ALJ found he is capable

12   of simple, unskilled work which takes into account his concentration limitations, his need for

13   only simple tasks and instructions, and his need for limited public contact.  As the undersigned

14   found no error in the ALJ's RFC determination, there can be no error in the ALJ's decision to

15   utilize the Grids in light of that RFC.  The Grids are only inapplicable where there are sufficient

16   non-exertional limitations.  Here, the ALJ concluded Plaintiff's non-exertional limitations are

17   satisfied by finding he was only capable of performing unskilled, simple work.

18         The court agrees that as the ALJ properly considered Plaintiff's limitations in

19   finding that he is capable of unskilled work at any exertional limitations.  Accordingly, there was

20   no error in the ALJ utilizing the Grids to determine that there are jobs in the national economy, at

21   all exertional levels, Plaintiff would be capable of performing at the unskilled level.  Therefore,

22   the ALJ did not err in relying on the Grids instead of calling a vocational expert to testify.

23   / / /

24   / / /

25   / / /

26

## V.  CONCLUSION

Based on the foregoing, the court concludes that the Commissioner's final decision is based on substantial evidence and proper legal analysis.  Accordingly, IT IS HEREBY ORDERED that:

    1.    Plaintiff's motion for summary judgment (Doc. 21) is denied;

    2.    Defendant's cross-motion for summary judgment (Doc. 23) is granted; and

    3.    The Clerk of the Court is directed to enter judgment and close this file.

DATED:  March 31, 2010

                               **CRAIG M. KELLISON**
                               UNITED STATES MAGISTRATE JUDGE